Submitted on record and briefs December 14, 1981,
affirmed July 21, 1982

STATE OF OREGON,
*Respondent,*
*v.*
JACK ORVILLE FLACK,
*Appellant.*

(No. J80-2338, CA A21524)

648 P2d 857

Gary D. Babcock, Public Defender, and J. Marvin Kuhn, Chief Deputy Public Defender, Salem, filed the brief for appellant.

Dave Frohnmayer, Attorney General, William F. Gary, Solicitor General, and Richard David Wasserman, Assistant Attorney General, Salem, filed the brief for respondent.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Defendant appeals his convictions for attempted murder, assault in the first degree, ex-convict in possession of a firearm and unauthorized use of a vehicle. He contends that the trial court erred in instructing the jury that there is a disputable presumption that an unlawful act was done with an unlawful intent and in sentencing him as a dangerous offender. He also appeals the sentence imposed on his conviction after a plea of guilty to a charge of assault in the third degree, contending that the sentence is excessive.

Defendant was involved in a fight in a cafe. He produced a gun and fired two shots. He then left in a car driven by a friend. After hearing about the incident, Deputy Sheriff Burdic started watching for the car. He testified that, as he drove off the freeway in a marked police car, he saw defendant. He stopped his car and stepped out. Defendant approached, his hands in his pockets. Burdic, who was wearing a police jacket with badge, ordered defendant to stop and to remove his hands from his pockets. Defendant continued walking. Burdic pointed his gun at defendant and again ordered him to stop. When defendant was within seven or eight feet, he drew out a gun and exclaimed, "Die, motherfucker!" Burdic then fired. Defendant fired back. Burdic fell to the ground, paralyzed. Defendant then walked up and shot him in the stomach. He then got into Burdic's car and drove off.

Subsequent to defendant's arrest, he was interrogated by Officer Stuart. He told Stuart that he was involved in an altercation in the cafe and that he fired two shots. He had then left the area in a friend's car. After driving a short time, he had got out of the car, climbed over a guardrail and down a bank and smoked some marijuana. Approximately an hour later he came back up the embankment and began walking toward a bridge when he observed a car coming toward him with its lights shining. Defendant told Stuart that an officer was in the car with his gun pointed at him, and then he heard a shot. He instinctively fired back. The officer fell to the ground. He then walked over and intentionally shot the officer "to keep him busy," after which he jumped in the officer's car and drove away.

Detective Bates testified that he interviewed one Pascal Wall, who had been sleeping in a van near the scene of the shooting. He told Bates that he had observed defendant walk past talking to himself. Approximately 15 minutes later he heard footsteps and observed headlights. He then heard someone say, "Take your hands out of your pockets." Approximately 30 to 45 seconds later, he heard shots. When he looked out the van window, he saw a police car driving off.

Defendant testified that he was a "professional robber" by occupation, that he had been convicted of three felonies and that he had spent five years in the penitentiary. He acknowledged extensive familiarity with firearms and judged himself to be an expert in their use and care. He admitted that he had been carrying a. 32-caliber revolver. He testified further that he had left the cafe in a car driven by a friend, had got out at an interchange, had gone over a guardrail and down an embankment and had stayed there about· an hour. He had smoked some marijuana. He also had drunk quite a bit, but was not intoxicated. He had known where he was. His purpose in hiding was to avoid a confrontation with the police or anyone else. He had intended to make his way back to his motel. He had climbed back up the embankment and over the guardrail and started walking toward a bridge when he saw parking lights and then headlights come on. A car approached. He strongly suspected that it was a police car, but he kept walking. The car kept pulling up on him. Because of the glare from the car's lights, he could not see, so he had bent underneath the lights, at which time he was shot in the chest. Instinctively, he had fired back. He testified that the officer "never said a word to me."

Defendant also testified that, when Burdic was hit, he fell out of his police car "making motions with his hands. * * * [H]is hand inside his jacket * * * groping around. * * * [He] shot me once and I wasn't about to let him shoot me again." In response to the question, "What did you do?," defendant replied, "I intentionally shot him again * * * to disable him." Defendant asserted at trial that his first shot was fired in self-defense and that his second was intended only to disable the officer. He also raised the

issue of voluntary intoxication in an attempt to negate any specific intent to kill.

Defendant first contends that the trial court erred in instructing the jury that it is presumed that an unlawful act was done with an unlawful intent. He argues that the instruction unconstitutionally shifted the burden of proof by requiring him to overcome the presumption.

The trial court instructed the jury:

" * * * Now the law provides for certain disputable presumptions which are to be considered as evidence. A presumption is a deduction which the law expressly directs to be made from particular facts and is to be considered by you along with other evidence. However, since these presumptions are disputable presumptions only they may be outweighed or equaled by other evidence. Unless outweighed or equaled, however, they are to be accepted by you as true.

"The following disputable presumptions may be applicable in this case. First, a person is innocent — it is presumed that a person is innocent of crime or wrong. Secondly, it is presumed that an unlawful act was done with an unlawful intent; and third it is presumed that a person intends the ordinary consequences of his voluntary acts.

"Now in deciding this case you are to consider all of the evidence which you find worthy of belief presented by either party bearing on each question regardless of which party has the burden of proof on that question.

"In this case the Defendant has no burden of proof and the entire burden of proof is on the State beyond a reasonable doubt."

In *Sandstrom v. Montana,* 442 US 510, 99 S Ct 2450, 61 L Ed 2d 39 (1979), the Supreme Court explained:

"The threshhold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes. * * * That determination requires careful attention to the words actually spoken to the jury * * * for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." 442 US at 514.

The Supreme Court found that the words actually spoken to the jury in *Sandstrom* could have led the jury to believe that it was required to apply the presumption explained by the trial court:

"* * * They were not told that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory. * * *

"* * * * *

"* * * They were not told that the presumption could be rebutted * * * by the defendant's simple presentation of 'some' evidence; nor even that it could be rebutted at all. * * *" 442 US at 515-17.

Therefore, the Supreme Court concluded, the challenged instruction violated defendant's Fourteenth Amendment right to due process.

The Oregon Supreme Court has held that use of the words "disputable presumption" or "presumption" in a jury instruction on the intent element of a crime is impermissible when the presumption runs contrary to the burden of proof in the case, because

"* * * [s]uch language is suggestive that the state does not have to carry the burden of proof on the intent element. * * *."[1] *State v. Stilling,* 285 Or 293, 297-98, 590 P2d 1223, *cert den* 444 US 880 (1979).

In *State v. Bartolon,* 8 Or App 538, 550, 495 P2d 772 (1972), we noted that

"* * * the use of this statutory instruction [former ORS 41.360(2)] is subject to justified and logical criticism in many if not most of the cases where it traditionally has been used. * * * [T]he wise course is not to give this instruction."

*See also Ulster County Court v. Allen,* 442 US 140, 99 S Ct 2213, 60 L Ed 2d 777 (1979); *State v. Johnson,* 55 Or App 98, 103-104, 637 P2d 211 (1981), *rev den* 292 Or 722 (1982); *State v. Olson,* 39 Or App 383, 386, 592 P2d 273 (1979).

---

[1] The Supreme Court held, however, that the instruction given in *State v. Stilling,* 285 Or 293, 590 P2d 1223, *cert den* 444 US 880 (1979), did not deny defendant due process but that if it was error, it was harmless.

The state argues that, taken together, the instructions here made it clear to the jury that the challenged instruction was concerned with only a disputable presumption which may have been applicable in the case and that the jury was specifically instructed that defendant had no burden of proof and that the entire burden of proof was on the state beyond a reasonable doubt. Therefore, it argues, taking the instructions as a whole, the jury was correctly instructed that defendant had no burden of proof.

■    In reviewing an instruction excepted to, we review the instructions given as a whole. *State v. Allen,* 25 Or App 797, 799, 551 P2d 120, *rev'd on other grounds,* 276 Or 527, 555 P2d 443 (1976). The trial court instructed the jury that:

" * * * * *

"The following disputable presumptions may be applicable in this case.

" * * * * *

"However, since these presumptions are disputable presumptions only they may be outweighed or equaled by other evidence.

" * * * * *

"In this case the Defendant has no burden of proof and the entire burden of proof is on the State beyond a reasonable doubt."

During other portions of the instructions, the court instructed the jury approximately two dozen times that the state had the burden of proving each element of an offense beyond a reasonable doubt. Although we disapprove of the challenged instruction and urge that it never be given, taking the instructions as a whole, we conclude that the jury was correctly instructed. We find no error.

■    Assuming *arguendo* that the instruction was error, we conclude that it was harmless error beyond a reasonable doubt. *Chapman v. California,* 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967); Or Const, Art VII (Amended), § 3; *see, e.g., State v. Naylor,* 291 Or 191, 196, 629 P2d 1308 (1981); *State v. Stilling, supra.* There was overwhelming evidence that defendant was guilty of all crimes charged. He was tried for attempted murder, assault in the first degree,

ex-convict in possession of a firearm and unauthorized use of a vehicle. In essence, he admitted his guilt of the latter three crimes. He specifically testified that he intentionally shot deputy Burdic to disable him before he stole Burdic's car. He admitted that he previously had been convicted of three felonies and that he had spent five years in the penitentiary. The jury heard him testify and heard his counsel argue his defenses of self-defense and voluntary intoxication. The jury obviously chose not to believe him. If there was error, it was very unlikely to have changed the result of the trial. *State v. Stilling, supra,* 285 Or at 300-301.

■ Defendant next contends that the trial court erred in sentencing him as a dangerous offender. ORS 161.725.[2] Substantial evidence in the record supports the trial court's conclusion that defendant was a dangerous offender.

Defendant last contends that the trial court erred in sentencing him excessively on his conviction after a plea of guilty to third degree assault. We find no error or basis for modification of the sentence. *State v. Dinkel,* 34 Or App 375, 387, 579 P2d 245 (1978), *rev den,* 285 Or 195 (1979).

Affirmed.

---

[2] ORS 161.725 provides:

"The maximum term of an indeterminate sentence of imprisonment for a dangerous offender is 30 years, if the court finds that because of the dangerousness of the defendant an extended period of confined correctional treatment or custody is required for the protection of the public and if it further finds, as provided in ORS 161.735, that one or more of the following grounds exist:

"(1) The defendant is being sentenced for a Class A felony, and the court finds that he is suffering from a severe personality disorder indicating a propensity toward criminal activity.

"(2) The defendant is being sentenced for a felony that seriously endangered the life or safety of another, has been previously convicted of a felony not related to the instant crime as a single criminal episode, and the court finds that he is suffering from a severe personality disorder indicating a propensity toward criminal activity.